NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0005n.06

Case No. 25-1074

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 06, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| FATAI OKUNOLA, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: GIBBONS, STRANCH, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Defendant Fatai Okunola appeals his sentence after pleading guilty to conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, making a false statement related to naturalization in violation of 18 U.S.C. § 1015(a), and money laundering in violation of 18 U.S.C. § 1957. Okunola's criminal case arises out of his involvement in a scheme to defraud vulnerable individuals online. Okunola, as recipient of the fraudulent funds, coordinated their disbursement. The district court sentenced him to 121 months in prison. Okunola now challenges his sentence as procedurally and substantively unreasonable. For the reasons stated below, we affirm Okunola's sentence.

I.

Beginning around 2015, Okunola engaged in a Nigerian-based conspiracy to defraud with certain uncharged co-conspirators. The conspiracy involved identifying vulnerable individuals

online and tricking them into sending money through a variety of internet schemes. Okunola acted as a "money mule," meaning that he served as the United States-based individual who ultimately received the funds that these victims sent. At the direction of the Nigerian co-conspirators, the victims sent cash or money orders to Okunola through the mail or via wire transfer. Upon receipt of the money, Okunola then distributed the fraudulent funds to the Nigerian co-conspirators.

Three other individuals connected to Okunola were named as defendants in this case. The co-defendants similarly acted as money mules in furtherance of the conspiracy. One of the co-defendants, Cory McDougal, the stepbrother of Okunola's wife, became involved in the conspiracy through Okunola. According to McDougal, he began accepting money into his personal accounts at the direction of Okunola, who told him when money would be put into his account, and, upon receipt, McDougal would transfer those funds to Okunola either via cash or using money-transferring applications, such as Zelle.

During the investigation, law enforcement intercepted packages sent to Okunola via mail containing cash and money orders from the victims. Law enforcement also retrieved images from Okunola's cellphone depicting money orders from the victims and WhatsApp messages revealing conversations between Okunola and his co-conspirators indicating their preference for blank money orders from victims. McDougal confirmed that he received cash and money orders from victims as part of the conspiracy. In a proffer interview, Okunola admitted that most of the money he had received while in the United States stemmed from the fraud. Records revealed that the defendants in this case caused at least $2,500,000 in losses and moved over $1,000,000 overseas.

After entering into a plea agreement, Okunola pleaded guilty to conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (count 1), making a false statement related to naturalization in violation of 18 U.S.C. § 1015(a) (count 3), and money laundering in violation of

18 U.S.C. § 1957 (count 13). As part of the plea agreement, Okunola agreed to a factual basis for his guilt which included an admission that he received cash and money orders from victims as part of the conspiracy.

The government contracted a forensic accountant, who examined the bank accounts used by the defendants, excluded any internal transfers, legitimate income, or other identifiable non-criminal money transfers, and prepared a chart indicating a loss amount. The PSR adopted this forensic analysis. And the district court similarly relied on its data in finding that Okunola was responsible for $1,781,916.40, which included over $800,000 in cash deposits and over $200,000 in money orders. Of the money orders, approximately $94,000 were not attributable to any specific victim.

During sentencing, as it relates to count 1, the district court found a base offense level of 7 and added 16 levels based on the loss amount. The court added two levels for an offense involving more than ten victims that resulted in substantial financial hardship to at least one; two levels because a substantial part of the fraudulent scheme occurred outside of the United States; one level for a conviction under 18 U.S.C. § 1957; two levels because Okunola knew or should have known that the offense involved vulnerable victims; and three levels for Okunola's role as a manager or supervisor in the offense. The court deducted three levels for acceptance of responsibility. It then determined a Guidelines range of 97 to 121 months for count 1, based on an offense level of 30 and criminal history category of one. The court denied Okunola's motion for a downward variance. And after considering the 18 U.S.C. § 3553(a) factors, the court sentenced Okunola to 121 months in prison for count 1, 60 months for count 3, and 120 months for count 13, all to be served concurrently. Okunola now challenges his sentence as procedurally and substantively unreasonable.

II.

We review both the procedural and substantive reasonableness of a sentence under the abuse-of-discretion standard. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). In doing so, we review factual findings for clear error and legal conclusions de novo. *Id.* But for claims of procedural reasonableness "[w]here a defendant fails to properly preserve an issue for appeal, that claim is subject to review for plain error only." *United States v. Herrera-Zuniga*, 571 F.3d 568, 580 (6th Cir. 2009).

"Procedural reasonableness requires the court to 'properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence.'" *Parrish*, 915 F.3d at 1047 (quoting *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018)). Substantive reasonableness focuses on the length of the sentence. *Id.* A sentence is substantively reasonable if it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (citation modified).

III.

First, Okunola argues that the district court erred in calculating his Guidelines range because it considered all the cash and money orders in his account in its calculation of loss. We see no error in the district court's method for calculating Okunola's loss amount. We have previously recognized the difficulties district courts can face in trying to calculate loss in fraud cases, and have concluded that "the district court 'need only make a reasonable estimate' of the loss." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (quoting *United States v.*

*Jones*, 641 F.3d 706, 712 (6th Cir. 2011)). And it need not do so "with precision." *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004) (citation omitted). Although we consider de novo the district court's method used to calculate loss, we will accept its factual findings as to the amount of loss so long as they are not clearly erroneous. *Wendlandt*, 714 F.3d at 393. "An error with respect to the loss calculation is a procedural infirmity that typically requires remand." *Id.* (quoting *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010)).

The government must prove the loss amount by a preponderance of the evidence. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). If the government shows "that the fraud or scheme 'was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate.'" *United States v. Bryant*, 849 F. App'x 565, 572 (6th Cir. 2021) (quoting *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019)).

Section 2B1.1 of the United States Sentencing Guidelines, which covers fraud and other property-loss offenses, instructs sentencing courts to raise the base offense level in relation to the monetary loss occasioned by the defendant's conduct. U.S.S.G. § 2B1.1(b); *see also United States v. Agrawal*, 97 F.4th 421, 435–36 (6th Cir. 2024). Relevant here, the Guidelines provide that a monetary loss between $550,000 and $1,500,000 garners a fourteen-level increase. U.S.S.G. § 2B1.1(b)(1)(H)–(I). And where the loss is between $1,500,000 and $3,500,000, the district court should increase the base offense level by sixteen. *Id.* at § 2B1.1(b)(1)(I)–(J).

Here, it was reasonable for the district court "to find that almost all of the cash and unaccounted for money orders that went through Okunola's and McDougal's accounts came from the frauds." (Appellant's Br., ECF 16, 11). The district court found that Okunola was responsible for $1,781,916.40. As noted, over $1,000,000 of this sum came from a combination of cash

deposits and money orders received. And even though $94,000 in money orders was not attributable to any specific victim because the payor information on the money orders was left blank, the court still had a basis for counting them in the overall loss amount. Specifically, in crediting the cash and money orders—including the blank money orders—the district court credited Okunola's admission in his plea agreement that he received cash and money orders from victims. Further, the government introduced evidence showing that law enforcement had intercepted packages containing cash that were mailed to Okunola. Beyond that, images from Okunola's cellphone depicted money orders from the victims, and WhatsApp messages revealed conversations between Okunola and his co-conspirators indicating their preference for blank money orders. And McDougal told law enforcement that the fraud conspiracy involved receiving cash and money orders from victims. Relatedly, in a proffer interview, Okunola told law enforcement that most of the money he had received while in the United States was from fraud. Given all the corroborating evidence, the district court did not clearly err in finding that most, if not all, the money in the accounts stemmed from the fraud. This is buttressed by Okunola's failure to provide any reasonable or legitimate basis for the money in the account.

Having found that the fraud was "so extensive that it's hard to separate legitimate from fraudulent income," the district court shifted the burden to Okunola to show that any particular amount was legitimate. (Sentencing Tr., R. 198, PageID 1436). At sentencing, as he does now on appeal, Okunola claimed that the money came from his car-selling business and money that he brought from Nigeria when he moved to the United States. The district court rejected these explanations because Okunola presented no evidence that he was involved in car sales; that the money in his account was, in fact, profit generated from such sales; or that he actually brought money with him from Nigeria. In considering Okunola's explanation, the district court noted that

for the years that Okunola filed taxes during the relevant time period, his tax returns showed income of only about $15,000 per year—an amount that would not account for a significant portion of the money in his accounts.

Considering the evidence presented at sentencing, the district court did not clearly err in including the complete sum of the cash and money orders in his account in the loss calculation. *See United States v. Montgomery*, No. 20-5891, 2022 WL 2284387, at *13 (6th Cir. June 23, 2022) (rejecting argument that legitimate claims should have been subtracted from loss amount where "the defendants presented no contrary evidence to set apart or establish the legitimacy of any claims"); *Lovett*, 764 F. App'x at 460 (finding that "[t]he defendants did not sufficiently rebut the Government's calculation" because they "did not put forth any evidence showing a specific amount by which the Government's loss calculation should be reduced").

Okunola also claims that the district court failed to account for $291,000 in employment income that he earned from 2018 to 2023, as indicated in the PSR. Because Okunola did not raise this argument during his sentencing, we review it for plain error. To establish plain error, Okunola "must show the district court committed (1) an error that was (2) plain and (3) affected his 'substantial rights.' If he can satisfy those three 'threshold requirements,' then we have discretion to grant relief only if (4) we conclude 'that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Simmonds*, 62 F.4th 961, 964 (6th Cir. 2023) (internal citations omitted) (quoting *Greer v. United States*, 593 U.S. 503, 507–08 (2021)). It is hard to meet all four requirements. *Greer*, 593 U.S. at 508. And we will "reverse only in exceptional circumstances to correct obvious errors that would result in a miscarriage of justice." *United States v. Hymes*, 19 F.4th 928, 933 (6th Cir. 2021).

Here, the government's forensic accountant omitted sources of legitimate income from the loss charts that the PSR adopted. So the loss amount already accounted for any employment income that would have been reflected in his bank account. Okunola did not object to the forensic accountant's findings, methodology, or the inclusion of this data in the PSR, so it was reasonable for the district court to rely on it. And, on appeal, he does not appear to challenge the district court's method for calculating loss (only the calculation itself). Thus, we have no basis to conclude that the district court plainly erred in not subtracting from the loss amount the $291,000 of alleged legitimate income.

Okunola also appears to argue that he is not subject to the burden-shifting framework that would require him to make a showing that any amount in the loss calculation was legitimate. The government counters that, in cases like Okunola's, where it is impracticable to separate fraudulent funds from the legitimate ones, it would seem contrary to "reward[]" Okunola "for his efforts to make his fraud untraceable." (Appellee's Br., ECF 27, 33). Moreover, Okunola "should not reap the benefits of a lower sentence because of his ability to defraud . . . to such an extent that an accurate loss calculation is not possible." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). Ultimately, we need not resolve this aspect of the parties' dispute. For even if the burden rested with the government at all times, the district court did not clearly err in finding that the money in Okunola's accounts stemmed from the fraud. In other words, "the court still could have concluded that the [] loss amount was best represented" by the $1,781.916.40, and "the record offers no basis for concluding that the court would have landed on a materially different amount." *United States v. Bertram*, 900 F.3d 743, 752–53 (6th Cir. 2018).

Finally, Okunola raises concerns about the loss calculation double counting money transferred from McDougal's account to Okunola's, which added $137,000 to the loss amount.

Even if we subtracted the $137,000 from the total loss amount, however, the loss calculation would still exceed $1,500,000. Thus, it would make no difference to the enhancement level assigned Okunola under U.S.S.G. § 2B1.1.

Accordingly, Okunola has not demonstrated that his sentence was procedurally unreasonable.

IV.

Okunola also challenges the substantive reasonableness of his sentence, arguing that his sentence is too long. To begin, the district court considered all of the factors set forth in 18 U.S.C. § 3553(a), calculated Okunola's Guidelines range as 97 to 121 months, and imposed a sentence at the top of the advisory range. Because this sentence is within-Guidelines, we presume it is reasonable. *United States v. Perez-Rodriguez*, 960 F.3d 748, 754 (6th Cir. 2020). Okunola bears the burden of rebutting this presumption. *See United States v. Paull*, 551 F.3d 516, 529 (6th Cir. 2009). His efforts fall short here.

First, Okunola argues that the district court gave outsized weight to the Guidelines, while giving short shrift to the § 3553(a) factors. But "the manner in which a district court chooses to balance the applicable sentencing factors is beyond the scope of the Court's review." *United States v. Sexton*, 894 F.3d 787, 797 (6th Cir. 2018) (citation omitted). And an "argument that the sentencing factors should have been balanced differently is not sufficient to rebut" the presumption of reasonableness that applies to Okunola's within-Guidelines sentence. *United States v. Price*, 901 F.3d 746, 752 (6th Cir. 2018).

Here, the district court gave thoughtful consideration to both the advisory Guidelines and the § 3553(a) factors before arriving at a within-Guidelines sentence. The district court expressed the importance of ensuring accountability for Okunola's actions. And contrary to Okunola's

assertion, the district court considered the nature and circumstances of the offense, emphasizing the severity and seriousness of the criminal conduct, the impact the fraud had on the victims, the large number of people affected, the vulnerability of the victims, and the extensiveness of the fraud. Likewise, it expressly considered Okunola's history and characteristics, observing that Okunola had a stable upbringing, basic necessities, an educational background in computing and accounting, and no history of mental health issues or substance abuse. These observations suggested to the court that Okunola's conduct was rooted merely in a desire for easy and fast money. Accordingly, the district court recommended more educational and vocational training so that Okunola can improve his skills and obtain legitimate employment.

Additionally, the district court "look[ed] at all of the kinds of sentences that are available" in an effort to "avoid[] disparity" and considered that Okunola "owe[s] a great amount of restitution." (Sentencing Tr., R. 198, PageID 1471). The district court acknowledged Okunola's lack of prior criminal history and the fact that Okunola had family support but concluded that these points did not "override[] all these other serious factors." *Id.* The district court did not abuse its discretion in imposing a within-Guidelines sentence after properly considering all of the § 3553(a) factors.

Resisting this conclusion, Okunola argues that the district court failed to consider the collateral consequences of his sentence, particularly those attendant to his immigration status. True, a sentencing court may consider immigration status as a factor warranting either an upward or downward variance depending on the context. *United States v. Chowdhury*, 438 F. App'x 472, 476 (6th Cir. 2011). For instance, a court could conclude that "potential deportation and fewer prison opportunities should be a reason for a downward variance" or it may conclude that "a person granted the benefit of entry to the country should be subject to an upward variance for abusing the

privilege." *United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009). "[E]ither approach is within the discretion of the sentencing court." *Id.* Okunola, however, never argued that his immigration status or pending deportation warranted a lighter sentence. *See United States v. Ocon-Fierro*, 425 F. App'x 457, 459 (6th Cir. 2011). In any event, the district court took into account Okunola's immigrant background, stating "many people come to this country for a better life. You came to this country to ruin a lot of peoples [sic] lives, and you . . . accomplished that." (Sentencing Tr., R. 198, PageID 1471). The court also advised Okunola that he would be subject to deportation proceedings following his imprisonment. (*See id.* at 1473). In this way, the district court considered Okunola's immigration status in determining his sentence. *See United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (explaining that a district court need only show that it "listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account in sentencing him." (citation modified)).

Okunola also claims his sentence is too long because he received a longer sentence than what the Guidelines recommend for persons who commit violent crimes. We have rejected "the comparison of a defendant's sentence to sentences imposed in other singular cases," including where a defendant "compares his sentence to lesser sentences imposed in cases involving purportedly more egregious conduct." *United States v. Vallier*, 711 F. App'x 786, 788 (6th Cir. 2018). When the district court considers the need to avoid unwarranted sentencing disparities, it does so "among defendants with similar records who have been found guilty of similar conduct." *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009); *Rayyan*, 885 F.3d at 442 (explaining that "§ 3553(a)(6) concerns national disparities within a class of similar defendants, not disparities between one defendant and another"). As we explained, the sentencing court here properly considered the kinds of sentences available in an effort to avoid sentencing disparities. Relatedly,

Okunola argues that the district court erred in failing to refer to the Judicial Sentencing Information data during sentencing. But this court has never "required a district court to consult the Sentencing Commission's collected data before issuing a sentence." *Hymes*, 19 F.4th at 935. Instead, the focus should be "on how the district court calculates a defendant's Guidelines range," which "necessarily take[] into account the need to avoid unwarranted sentence disparities, viewed nationally." *Id.* (citation omitted). Therefore, the district court did not err in that regard.

Okunola also suggests that since his attributed loss amount of about $1.8 million was at the bottom of the $1.5 million-to-$3.5 million range set forth in § 2B1.1(b)(1), he should not have received a sentence at the top of the Guidelines range. But the calculation of the applicable Guidelines range is only one part of the district court's ultimate sentence determination. The district court also "consider[s] all of the § 3553(a) factors" and "make[s] an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). The district court's review of the § 3553(a) factors in this case suggests that it imposed a top-of-the-Guidelines sentence due, in part, to the severity and impact of the crime, the need to ensure accountability, and the district court's belief that Okunola lacked remorse.

Finally, Okunola argues that the district court should have accorded less weight to the Guidelines and imposed a lower sentence based on policy reasons, namely because the loss amount calculus of the fraud Guidelines does not reflect "the moral seriousness" of the offense. (Appellant's Br., ECF 16, 16–17). A district court may vary from the Guidelines and impose a different sentence if it disagrees with the Sentencing Commission's views, particularly where "the Commission's views rest on wholly unconvincing policy rationales." *Pepper v. United States*, 562 U.S. 476, 501 (2011). However, there is no indication that the district court had any such policy disagreement with the fraud Guidelines. And even if it did harbor some disagreement, the court

was not required to reject the Guidelines range altogether. *See United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011). Moreover, we do not demand "a district court to independently assess the empirical support for a specific Guideline, to delve into the history of the Guideline, or otherwise satisfy itself that the Guideline is proper." *United States v. Massey*, 663 F.3d 852, 862 (6th Cir. 2011). The district court thoroughly considered all relevant sentencing factors—including the Guidelines and the § 3553(a) factors—and did not abuse its discretion in arriving at a within-Guidelines sentence.

V.

For the reasons stated, we **AFFIRM** Okunola's sentence.